UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRY HAGGERTY,

        Plaintiff,

        v.

                      Case No. 23-cv-1532-pp

PACIFIC SANDS, INC., MICHAEL MICHIE,
JAMES MADERSKI and GORDON BROOKS,

        Defendants.

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS (DKT. NO. 13)

On November 15, 2023, the plaintiff—who is a shareholder and former board member of Pacific Sands, Inc.—filed this derivative action against Pacific Sands and against Michael Michie, James Maderski and Gordon Brooks, members of Pacific Sands' board of directors. Dkt. No. 1. Broadly, the complaint alleges that Michie—as CEO of Pacific Sands—engaged in a pattern of self-dealing and willful misconduct that exposed Pacific Sands to actual and potential liability. Id. The plaintiff further alleges that despite his continual requests for the board to remove or to further investigate Michie, the other board members refused to take corrective action against Michie. Id. Based on these allegations, the plaintiff brings four derivative actions: (1) breach of fiduciary duty against Michie for his actions as CEO, (2) equitable accounting against all defendants, (3) unjust enrichment against Michie and (4) breach of

fiduciary duty against Michie, Maderski and Brooks for their actions as members of the board of directors. Id. at ¶¶182-221.

On February 2, 2024, the defendants filed a motion to dismiss. Dkt. No. 13. The court will deny the defendants' motion because they based their arguments on inapplicable law.

## I.    Factual Background

The complaint states that Pacific Sands is a Nevada corporation with its principal place of business in Kenosha, Wisconsin; it manufactures household and commercial cleaners. Dkt. No. 1 at ¶¶10–11. The complaint alleges that the plaintiff is a shareholder, a former member of Pacific Sands' Board of Directors (the Board) and formerly the company's chief financial officer (CFO). Id. at ¶¶7–9. The plaintiff began working as a full-time consultant for the Board in January 2016. Id. at ¶¶23-27. The plaintiff maintained this consulting position until January 2019, when he was elected chairman of the board and named the CFO and treasurer of Pacific Sands. Id. at ¶¶32–33.

The plaintiff alleges that in February 2022, a review of the company's accounts revealed that Pacific Sands' chief executive officer—Michie—had "manipulated the books and records for Pacific Sands, in relation to a Pacific Sands' cash account over which Michie had sole control and access." Id. at ¶35. The plaintiff alleges that Michie created a false invoice for the sale of $18,000 of Pacific Sands' products and sent it to a customer with instructions to wire payment to the cash account Michie controlled. Id. at ¶¶36–37. The plaintiff asserts that after the customer paid the false invoice, Michie created a

"real" invoice for $12,000 and entered that invoice into the company's financial records, but did not send that invoice to Customer No. 1. Id. at ¶38. The complaint contends that Michie then transferred $12,000 from the cash account to Pacific Sands' general checking account to cover the $12,000 invoice that never was sent. Id. at ¶39. Michie allegedly took the excess $6,000 from the cash account and deposited it into his own personal checking account. Id. at ¶40.

The plaintiff states he informed Maderski—who, at that time, was the only board member other than himself and Michie—of Michie's conversion of $6,000 from Pacific Sands. Id. at ¶¶42-43. The plaintiff states that he and Maderski agreed that Michie should be terminated and removed from the Board. Id. at ¶43. The plaintiff alleges that he worked with Pacific Sands' counsel to develop a termination plan that would protect the company's assets, which included an audit to secure a copy of Michie's emails and computer files. Id. at ¶¶44–45. According to the plaintiff, Brooks joined the board as its fourth member shortly after these events. Id. at ¶46. The plaintiff alleges that together, Brooks and Maderski reversed the decision to terminate Michie and remove him from the Board, without discussing it with the plaintiff. Id. at ¶47.

The complaint alleges that after discovering Michie's conversion, the plaintiff reviewed all activity relating to Pacific Sands' transactions with the involved customer. Id. at ¶53. The plaintiff learned that Michie had approved a 66% discount of $42,140 to this customer despite Pacific Sands' policy that prohibited discounts of over twenty percent without approval from the board.

3

Id. at ¶¶54-55. The plaintiff asserts that he reported the unauthorized discount to Brooks and Maderski and recommended further investigation to determine whether Michie personally had benefitted from the transaction. Id. at ¶56. The plaintiff alleges that the board chose to not investigate the unauthorized discount. Id. at ¶¶57-59.

The plaintiff alleges that in the spring of 2022, he also learned that Michie had used Pacific Sands' assets to "pay certain business expenses of his life partner's dog walking business[,]" which is separate and unrelated to Pacific Sands. Id. at ¶¶61-62. These expenses included "cell phone bills, charges for internet service, and other expenses." Id. at ¶62. The complaint alleges that Michie used company computers "to maintain a database of all home addresses and alarm security codes for customers of CEO Michie's life partner's dog walking business." Id. at ¶63. The plaintiff alleges that this exposed Pacific Sands to liability from the customers of the dog walking business, whose personal information might have been accessed by third parties. Id. at ¶64. The complaint asserts that the Board knew of Michie's activities, yet again took no action against him. Id. at ¶¶65-66.

The complaint alleges that Michie secretly promised the employee he had tasked with obtaining International Organization for Standardization (ISO) certification for Pacific Sands a $10,000 bonus if she successfully obtained the certification. Id. at ¶¶71-73. According to the complaint, when Pacific Sands obtained ISO certification in January 2022 and the employee asked Michie when she would receive her bonus, Michie "told her that he was having

4

difficulty getting the Board of Directors to approve it." Id. at ¶¶74-75. The plaintiff states that this was a lie, because board approval was not necessary for expenses under $50,000. Id. at ¶76. When the employee again asked Michie about the bonus, Michie told her that "Pacific Sands did not have the funds to pay it," which was not true. Id. at ¶¶77-78. The plaintiff did not learn about the promised bonus until late 2022, when the employee "resigned without notice and told key employees that they should look for new jobs, because Pacific Sands could not pay its bills for something as small as the $10,000 bonus promised by CEO Michie." Id. at ¶¶79, 81. The plaintiff alleges that Pacific Sands ultimately settled with the employee for $40,000, which included the $10,000 bonus Michie had promised. Id. at ¶80. The plaintiff alleges that Michie's actions caused the company to incur this needless liability, but that the board took no action against Michie in response. Id. at ¶85.

The complaint further alleges that after Pacific Sands obtained its ISO certification, Michie intentionally began violating the terms of the certification. Id. at ¶87. It asserts that Michie and his subordinates filled laundry powder containers with deck and patio cleaning products and sold it to customers. Id. The plaintiff alleges that Michie did this to avoid buying additional supplies of the enzymes used in the laundry powder. Id. at ¶88. The plaintiff alleges that he threw out all the laundry powder labels to prevent further tampering, reported Michie's actions to the board and asked that Pacific Sands implement a board-level quality control policy. Id. at ¶89–90. The complaint alleges that

5

"[t]his was one of five written requests that these actions be taken, and all five were intentionally refused by [the board]." Id. at ¶91.

The complaint alleges that on March 7, 2023, another customer visited the company to audit their quality control procedures prior to authorizing production on a large number of open sales orders. Id. at ¶93. The customer's audit raised issues with the company's ISO compliance. Id. The plaintiff states that after receiving the report, he again asked the board to prepare a quality control policy, which the board did not do. Id. at ¶95. The plaintiff alleges that he and the company's operations manager were forced to take actions to respond to the customer's concerns because Michie "refused" to learn about ISO program operations. Id. at ¶99.

The complaint alleges that shortly afterward, Pacific Sands' ISO accreditation nearly was suspended after an annual external audit revealed two major nonconformance issues. Id. at ¶¶101–102. The plaintiff asserts that these issues were similar to those raised in the customer's report. Id. at ¶105. He asserts that his efforts to overhaul the ISO program in response to the customer's report saved the company from losing its certification. Id. at ¶¶103–104. The plaintiff alleges that Michie was obligated to monitor and address the ISO issues but intentionally refused to do so. Id. at ¶109.

The plaintiff alleges that Michie told employees to transfer expired product into new bottles that were given new expiration dates in violation of ISO policies and procedures as well as product safety laws. Id. at ¶¶110–111. The complaint alleges that the board knew Michie had knowingly jeopardized

6

the company's ISO certification and "willfully refused to apprise himself of Pacific Sands' ISO certification requirements," but that "the Board again intentionally took no action against CEO Michie." Id. at ¶¶112-113.

The complaint alleges that in the spring of 2022, the plaintiff and the board learned that Michie required the company's hourly employees to contribute their overtime hours worked to a program that he called the "Overtime Bank." Id. at ¶¶115-120. Michie allowed hourly employees to take hours from the overtime bank as a form of paid time off, which was not otherwise available to hourly employees. Id. at ¶121. The complaint states that the hours deposited in the overtime bank were supposed to be paid at the rate of "time and a half," but that when employees used the overtime bank for paid time off, they were paid at their regular hourly rate rather than the overtime rate. Id. at ¶¶122-123. The complaint asserts that the company has paid out $7,000 in overtime pay to compensate employees for their unpaid overtime wages. Id. at ¶125. Upon learning of the overtime bank program, the plaintiff immediately discontinued it. Id. at ¶126. According to the complaint, the board learned about the overtime bank but chose not to hold Michie accountable. Id. at ¶¶127-129.

In August 2021, the plaintiff learned that since February 2021, Michie had "engaged a large electrical contracting firm" and "requested that a particular employee named 'Ken' perform" work for Pacific Sands. Id. at ¶130. According to the complaint, "Michie intentionally did not require Pacific Sands to make this proposed work subject to competitive bidding, and CEO Michie

7

knowingly failed to obtain any written scope of work terms from Ken." Id. at ¶131. In August 2021, a Pacific Sands accountant discovered that many of Ken's invoices were "substantially overstated." Id. at ¶132. The complaint asserts that when the accountant contacted the electrical contracting firm's accounting department, the firm terminated Ken and credited Pacific Sands $67,000 of an estimated $82,000 in fraudulent invoices. Id. at ¶133.

The plaintiff alleges that Michie requested that Ken's new employer send him to Pacific Sands to do more work for Pacific Sands. Id. at ¶¶133-134. The complaint alleges that Michie assigned Ken to do plumbing work for Pacific Sands despite Michie knowing that Ken was licensed as an electrician but not as a plumber. Id. at ¶135. The complaint describes Ken's plumbing work as "[u]nsurprisingly . . . substandard" and asserts that he issued more fraudulent invoices to the company. Id. at ¶136. The complaint says that after the company requested credit for those fraudulent invoices, Ken's new employer terminated him. Id.

By early 2022, the incidents involving Ken were reported to Brooks and Maderski. Id. at ¶138. The complaint explains:

> Director Maderski questioned [the plaintiff] as to whether [he] believed that CEO Michie was receiving "kickbacks" in connection with the repeatedly inflated and fraudulent invoices received by Pacific Sands, because there was no valid business reason why CEO Michie would insist that Pacific Sands continue working with someone who repeatedly sent fraudulent invoices to it.

Id. at ¶139. The plaintiff alleges that despite this, the board took no action against Michie and did not investigate further. Id. at ¶142.

The plaintiff also learned that, in November 2015, Michie "exchanged $108,153.00 in salary due to him for 15,450,437" shares of the company. Id. at ¶145. But Michie later requested that this exchange be reversed, and this reversal is reflected in a transaction that occurred on June 30, 2016. Id. at ¶148. The complaint explains that the plaintiff "believed that CEO Michie ultimately received substantial cash payments representing his deferred salary that he received as shares of common stock, but that CEO Michie refused to turn over those shares for which he received cash compensation, and the Board refused to require CEO Michie to do so." Id. at ¶149.

The board "purportedly hired James Demas, who it claimed (through counsel) was a CPA, to supposedly investigate this issue." Id. at ¶153. Demas—who allegedly is Michie's long-time friend and who later admitted he is not licensed as a CPA—prepared a written report, which concluded that Pacific Sands paid Michie $45,000 between October 2017 and October 2022 in exchange for Michie's shares. Id. at ¶¶154-158. But this written report also concluded that "CEO Michie still possesses 15,450,437 shares that he originally received for $108,153.00 in cash compensation due, but for which CEO Michie was only required to forego $63,153.00 in cash compensation." Id. at ¶160. This written report allegedly highlighted "the lack of supporting documentation for the transactions involving and related to the Shares" and the "absence of any agreements, Board resolutions, minutes, emails or any other correspondence for significant transactions including the issuance, reversal and reissuance of the Shares, the long term note payable and the

9

relate[d] debt discount." Id. at ¶164. The complaint alleges that in light of the findings of this written report, "the Board has knowingly permitted CEO Michie to continue to possess shares of Pacific Sands' common stock, which substantially exceed what CEO Michie earned as compensation, and to which CEO Michie is not entitled." Id. at ¶163.

The complaint alleges that Pacific Sands and its current board are in "violation of Nevada law" and its own by-laws because Pacific Sands and the board refuse to hold an annual meeting to elect the members of the board. Id. at ¶¶165-166. The complaint alleges that the company by-laws state that the company must hold an annual meeting of the shareholders on July 7 each year beginning in 1995. Id. at ¶166. The plaintiff alleges that Pacific Sands has not held an annual meeting since the company moved its business operations to Wisconsin in 2004. Id. at ¶167. He alleges that the by-laws also require at least one director to be elected annually at the shareholders meeting. Id. at ¶168. He alleges that the board has appointed all its directors without a shareholder vote and alleges that this also violates Nevada law. Id. at ¶171.

The complaint asserts that the plaintiff resigned from the board in December 2022 because of the board's "failures to properly exercise its oversight function relating to the above-summarized allegations, and other problems." Id. at ¶175. The plaintiff alleges that on June 4, 2023, he requested that the board schedule an annual meeting to elect directors. Id. at ¶179. The following day, the board "suspended [the plaintiff], without pay, purportedly for distributing Pacific Sands' Annual Report for 2022, and the 2023 Q1 Quarterly

10

Report to its shareholders." Id. at ¶176. The plaintiff explains that he always had distributed financial reports to shareholders without any Board objections. Id. at ¶178. The complaint observes that, "[s]hortly after [the plaintiff] was suspended, the Board of Directors stopped issuing quarterly reports to willfully make Pacific Sands less transparent to its shareholders, and to conceal the repeated malfeasance of CEO Michie alleged above." Id. at ¶180. It alleges that the Board gave Michie a 30 percent raise despite the "numerous misdeeds alleged above." Id. at ¶181.

The plaintiff alleges that he again raised all these issues to the board prior to filing this lawsuit, but that the board either did not respond or did not provide a response adequately addressing the plaintiff's concerns about Michie. Id. at ¶¶49–51, 60, 67, 86, 114, 143.

## II.     Procedural Background

The plaintiff brings four derivative causes of action: (1) breach of fiduciary duty against Miche; (2) equitable accounting against all defendants; (3) unjust enrichment against Michie; and (4) breach of fiduciary duty against Michie, Maderski and Brooks. Id. at ¶¶182–221.

The defendants ask to dismiss the complaint for several reasons. Dkt. No. 13. They state that they seek to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief, under Fed. R. Civ. P. 9(b) for failure to plead with particularity circumstances constituting fraud, under Fed. R. Civ. P. 23.1(a) and (b) for failure to comply with pleading requirements

11

for derivative actions and under several Nevada statutes governing corporations. Id. at 1–2.

At the pleading stage, only Fed. R. Civ. P. 12(b)(1) and 12(b)(6) could provide grounds for dismissal. The defendants' other "grounds" to dismiss the complaint challenge whether the complaint adequately states a claim for relief. The court will apply the Rule 12(b)(1) and 12(b)(6) standards to determine whether to dismiss the complaint.

### III.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to assert by motion that the complaint fails to state a claim upon which a federal court can grant relief. "A Rule 12(b)(6) motion tests 'the legal sufficiency of the complaint,' as measured against the standards of Rule 8(a)." Gunn v. Cont'l Cas. Co., 968 F.3d 802, 806 (7th Cir. 2020) (quoting Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind., 786 F.3d 510, 526 (7th Cir. 2015)). A complaint need not include detailed factual allegations, but it must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendants is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). In ruling on a Rule 12(b)(6) motion, the court takes "all the factual allegations in the complaint as true," id., and draws all reasonable inferences in the plaintiff's favor, Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016).

A party alleging fraud or mistake "must state with particularity the circumstances constituting [the] fraud or mistake." Fed. R. Civ. P. 9(b). To meet this particularity requirement, "a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir. 2011) (quoting United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 853 (7th Cir. 2009)). Under Rule 9(b), "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see also Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006).

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to assert the defense of lack of subject-matter jurisdiction by motion. Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint. Bultasa Buddhist Temple of Chi. v. Nielsen, 878 F.3d 570, 573 (7th Cir. 2017). In evaluating a challenge to subject-matter jurisdiction, the court first must determine whether the movant has raised a factual or a facial challenge. Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015). A factual challenge contends that "there is in fact no subject matter jurisdiction," even if the pleadings are formally sufficient. Id. (internal quotation and citation omitted). In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject-matter jurisdiction exists. Id. In contrast, a facial challenge argues that the plaintiff has not sufficiently "alleged a basis of subject matter jurisdiction." Id. (internal quotation and citation omitted). In reviewing a facial challenge, "the court must

13

accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id.

## IV. Motion to Dismiss

### A. Subject-Matter Jurisdiction

The defendants' subject matter jurisdiction argument focuses on the plaintiff's standing (or lack thereof) to challenge the defendants' failure to hold an annual stockholders' meeting. Dkt. No. 14 at 22-23. Although "[s]tanding is an element of subject-matter jurisdiction in a federal civil action," Moore v. Wells Fargo Bank, N.A., 908 F.3d 1050, 1057 (7th Cir. 2018), the defendants do not argue that the plaintiff lacks Article III standing. Rather, their argument relies entirely on Nevada law—specifically the requirements in Nevada Revised Statutes §78.345. The defendants contend that the plaintiff does not have, or represent, the requisite percentage of voting power to demand an election of directors under the law. Dkt. No. 14 at 22 (citing Nev. Rev. Stat. §78.345(1)). Whether the plaintiff has standing under the substantive law governing his claim is a different question than whether the plaintiff has Article III standing.

For a plaintiff to have Article III standing, he must have "(1) suffered a concrete, particularized, and actual or imminent injury (an 'injury in fact'), (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Morgan v. Fed. Bureau of Prisons, 129 F.4th 1043, 1048 (7th Cir. 2025). The defendants have not argued, or shown, that the plaintiff lacks any of these elements of Article III

14

standing. The court will not dismiss the case under Rule 12(b)(1) for lack of subject-matter jurisdiction.

The defendants also assert that the court lacks subject-matter jurisdiction because Nev. Rev. Stat. 78.345(2) requires the plaintiff to file his complaint in Clark County, Nevada—the location of Pacific Sands' registered office. Id. at 23. That is a question of proper *venue*, not of subject-matter jurisdiction. The defendants have not sought dismissal for improper venue under Fed. R. Civ. P. 12(b)(3); that defense is waived. See Fed. R. Civ. P. 12(h)(1)(A).

B.    Choice of Law

The parties dispute whether Nevada or Wisconsin law applies and many of the defendants' arguments turn on which law applies.

1.    *Procedural Law*

The defendants appear to contend that the plaintiff must satisfy *both* federal and state procedural law to bring his derivative actions. Specifically, the defendants assert that the plaintiff "fails to comply with Rule 23.1 of the Federal Rules of Civil Procedure *and* with Rule 23.1 of the Nevada Rules of Civil Procedure *both of which are applicable* in shareholder derivative actions." Dkt. No. 14 at 5 (emphasis added). The plaintiff responds that he "is not required to comply with both federal and state procedural pleading rules." Dkt. No. 17 at 21 (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

"[T]he Erie doctrine provides that 'federal courts sitting in diversity apply state substantive law and federal procedural law.'" Hahn v. Walsh, 762 F.3d

617, 629 (7th Cir. 2014) (quoting <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 427 (1996)). The complaint asserts that this federal court has subject-matter jurisdiction under 28 U.S.C. §1332(a)(1), the diversity statute. Dkt. No. 1 at ¶16. It also alleges facts supporting the court's exercise of diversity jurisdiction—that the plaintiff is a citizen of Illinois, that none of the defendants are citizens of Illinois and that the amount in controversy exceeds $75,000. <u>Id.</u>

So—because this federal court is sitting in diversity, and because federal procedural law governs the adequacy of pleadings in diversity cases, it must apply federal procedural law in considering the adequacy of the complaint. <u>Hahn</u>, 762 F.3d at 629. <u>See</u> <u>Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson</u>, 727 F.3d 719, 721-22 (7th Cir. 2013) (adequacy of pleadings in derivative suit is "measured by federal law—in particular, Rule 23.1"); <u>Boland v. Engle</u>, 113 F.3d 706, 710 (7th Cir. 1997) (derivative suits in federal court are governed by "federal procedural requirements and state substantive law").

### 2.  *Substantive Law*

The parties dispute whether Nevada law or Wisconsin law applies. The defendants argue that "Nevada law applies here because in derivative actions, such as this one, conflicts of law rules hold that courts must adjudicate corporate governance issues under the law of the state in which an entity is formed," and that, "[u]nder the internal affairs doctrine, the laws of the state of formation govern substantive issues in federal shareholder derivative suits."

16

Dkt. No. 14 at 8 (citing Edgar v. MITE Corp., 457 U.S. 624, 645 (1982); Fagin v. Gilmartin, 432 F. 3d 276, 282 (3d Cir. 2005)).

The plaintiff responds that, "[a]lthough Defendants rely heavily on the internal affairs doctrine, and mistakenly assert that this Court must apply Nevada law, they fail to provide the Court with any choice of law analysis in support of their mistaken assumption." Dkt. No. 17 at 14. The plaintiff argues that the court should apply the forum state's (Wisconsin's) choice-of-law rules to determine whether Nevada or Wisconsin's substantive law controls. Id. at 14-15. After detailing the steps of Wisconsin's choice-of-law analysis, id. at 15-18, the plaintiff concludes that "this federal court sitting in Wisconsin should apply Wisconsin law—to this company with its principal place of business in Wisconsin—to the wrongful acts that occurred in Wisconsin," id. at 18.

In reply, the defendants did not present their own choice-of-law analysis; they reasserted that, "[u]nder the internal affairs doctrine, the laws of the state of formation govern substantive issues in federal shareholder derivative suits." Dkt. No. 18. at 2 (citing Fagin, 432 F. 3d at 282). The defendants opine that their assertion that this court should apply Nevada law is "understandable," arguing that "(1) [the plaintiff's] Complaint is made against a Nevada corporation, as a Defendant, (2) his claim that Defendants did not comply with Nevada's law concerning shareholder meetings in violation of Nevada law, (3) his claim that Defendants failed to comply with Pacific Sands' By-Laws adopted under Nevada law." Id. at 10-11 (citing Dkt. No. 1 at ¶217). Alternatively, the

17

defendants assert that even applying Wisconsin law, the plaintiff has failed to plead sufficient facts to support this derivative action. Id. at 3.

"In diversity cases, [courts] look to the substantive law of the state in which the district court sits, including choice of law rules." Wachovia Sec., LLC v. Banco Panamericano, Inc., 674 F.3d 743, 751 (7th Cir. 2012) (citations omitted). Even the Fagin case, on which the defendant heavily relies, held that, "[i]n a case where state substantive law applies, [courts] *must apply* the forum state's choice-of-law rules." 432 F.3d at 282 (emphasis added) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941)). In Fagin, the Third Circuit applied the internal affairs doctrine because, "*[u]nder New Jersey's choice-of-law rules*, the law of the state of incorporation governs internal corporate affairs." Id. (emphasis added) (citing Brotherton v. Celotex Corp., 493 A.2d 1337, 1339 n.1 (N.J. Super. Ct. Law Div. 1985)). The court must look to Wisconsin's choice-of-law rules to determine which state's substantive law controls.

Wisconsin does not apply the internal affairs doctrine; Wisconsin courts apply a multi-step choice-of-law analysis. See Beloit Liquidating Tr. v. Grade, 270 Wis. 2d 356, 374 (Wis. 2004) (explaining that Wisconsin has "fail[ed] to adopt the internal affairs doctrine, either by statute or through case law," and holding that courts can apply Wisconsin law in analyzing claims against corporations formed under another state's law). Under Wisconsin law, "[t]he preliminary question in the choice-of-law analysis is whether the case presents an actual conflict of laws—that is, whether the law of the two states is

different." Story as Tr. for Story v. Marquette Univ., 728 F. Supp. 3d 948, 953 (E.D. Wis. 2024) (citing Waranka v. Wadena Ins. Co., 353 Wis. 2d 619, 636 (Wis. 2014)). "If there is a conflict then the court will proceed to a conflict analysis which considers first whether the other state has only minimal contacts with the action." Waranka, 353 Wis. 2d at 636 (citing Beloit Liquidating, 270 Wis. 2d at 374). "The law of the forum presumptively applies 'unless it becomes clear that nonforum contacts are of the greater significance.'" Story, 728 F. Supp. 3d at 953 (quoting Drinkwater v. Am. Fam. Mut. Ins. Co., 290 Wis. 2d 642, 658 (Wis. 2006)). "If more than minimal contacts exist, the court will then proceed to consider the predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." Waranka, 353 Wis. 2d at 636 (citing Beloit Liquidating, 270 Wis. 2d at 375).

Neither party has addressed the question of whether the laws of Wisconsin and Nevada are meaningfully different. The defendants' reply brief reasserts some of their Nevada law arguments under Wisconsin law and claims that, "if Wisconsin Law applies, [the plaintiff]'s complaint still fails to state a claim." Dkt. No. 18 at 3. But the defendants do not clarify whether they believe the complaint "still fails to state a claim" under Wisconsin law because Wisconsin law is similar to Nevada law, or because the plaintiff has failed to satisfy Wisconsin's unique legal requirements. The lack of briefing regarding this preliminary question means that the court cannot determine whether

19

Wisconsin law and Nevada law are different without engaging in its own research. It is the obligation of the parties to address this issue, and they did not. The court will assume without deciding that the states' laws differ and move to the next step in the choice-of-law analysis.

Wisconsin's contacts with this case are of "greater significance" than Nevada's contacts. See Story, 728 F. Supp. 3d at 953. Although it is true that Pacific Sands was incorporated in Nevada in 1994, the company "moved its business operations to Wisconsin in June 2004." Dkt. No. 1 at ¶¶19, 167. Pacific Sands' principal place of business is in Wisconsin and three of its directors—Michie, Maderski and Brooks—are from Wisconsin. Id. at ¶15. All the conduct alleged in the complaint occurred *after* Pacific Sands' 2004 move to Wisconsin. The earliest chronological allegation in the complaint is that Pacific Sands failed to conduct an annual stockholders' meeting in 2004, then failed to conduct a meeting in each subsequent year. The plaintiff's allegations regarding Michie's self-dealing and mismanagement—as well as those regarding the board's response to Michie's actions—involve events that occurred well after the company's move to Wisconsin. Nevada appears to have only "minimal contacts" with the allegations in the complaint. The court concludes that it should apply Wisconsin law. See Waranka, 353 Wis. 2d at 636; see also Finch v. Southside Lincoln-Mercury, Inc., 274 Wis. 2d 719, 743 (Wis. Ct. App. 2004) (observing that the defendant corporation's "only contact with Delaware was that it was incorporated there" and that the defendant corporation "did all of its business in Wisconsin," and concluding that

20

"'application of Delaware law in this case would constitute officious intermeddling with the laws of Wisconsin'").

C.    <u>Remaining Arguments</u>

Based on the court's choice-of-law analysis, Wisconsin substantive law—not Nevada substantive law—applies. That means that defendant's arguments based entirely on Nevada substantive law are waived because they are not supported by pertinent legal authority. <u>See</u> <u>United States v. Cisneros</u>, 846 F.3d 972, 978 (7th Cir. 2017) (stating that the Seventh Circuit has "repeatedly and consistently held that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived'" (quoting <u>United States v. Berkowitz</u>, 927 F.2d 1376, 1384 (7th Cir. 1991)).

The defendants' initial brief references only Nevada state law. Their reply brief repackages some of their arguments using Wisconsin law, but "arguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." <u>White v. United States</u>, 8 F.4th 547, 552 (7th Cir. 2021) (citations omitted). The defendants did make some arguments based on federal procedural law—they argued that the complaint failed to comply with Fed. R. Civ. P. 23.1 and 9(b). Rule 23.1 requires a plaintiff bringing a shareholder derivative action to state with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority [and] the reasons for . . . not making the effort." "Whether the content of the statement suffices to permit the shareholder to proceed with the litigation, however, depends on state substantive law." <u>Westmoreland Cnty. Emp. Ret. Sys.</u>, 727 F.3d at 725

(citing <u>Robert F. Booth Trust v. Crowley</u>, 687 F.3d 314, 316–17 (7th Cir. 2012)). The record briefing is insufficient to allow the court to determine whether the complaint satisfies Rule 23.1 because the defendants have not argued whether the plaintiff's actions are sufficient under Wisconsin law.

The same is true for the defendants' argument that the plaintiff failed to plead fraud with particularity under Rule 9(b). Whether the plaintiff has plead sufficient facts supporting a claim of fraud depends on the elements of the fraud claim. Because the defendants have based their arguments on the *Nevada* law governing fraud, rather than on the *Wisconsin* law governing fraud, the court is not equipped to address the question of whether the plaintiff has plead facts sufficient to state a fraud claim under Wisconsin law.

Because the defendants' arguments rely on inapplicable law, the court will deny the defendants' motion to dismiss.

## V.     Conclusion

The court **DENIES** the defendants' motion to dismiss the complaint. Dkt. No. 13.

The court **ORDERS** that the defendants must file an answer to the complaint by the end of the day on **January 9, 2026**.

Dated in Milwaukee, Wisconsin this 19th day of December, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

22